ROBERT A. SNYDER et al., as Executors, etc., Respondents, *v.* THE ATLANTIC MUTUAL INSURANCE COMPANY, Appellant.

Deviation from the course or employment of an insured vessel as described in the policy, unless compelled by necessity, at any time after the liability under the policy attaches, constitutes a defense to an action thereon, however slight or harmless the deviation may appear to be.

It is immaterial whether such deviation occurs during the time the vessel is in port waiting for the voyage to commence or takes place thereafter, if the policy covers the period of waiting by the use therein of the words "at and from."

A voyage risk "at and from" a given port attaches at the time of the commencement of preparations for the voyage.

On June 13, 1879, defendant issued a policy of marine insurance upon a steam tug then lying at St. Georges in the Bermudas, "at and from Bermuda to New York," to sail during July. Preparations for the voyage commenced June 30, and continued until the tug finally took her departure. On July 2, she left her berth at St. Georges and steamed to Hamilton, a port distant about twenty miles, where she took a schooner in tow, which she brought to St. Georges and from there towed out to sea a distance of about five miles, and then returned to her berth. On July 3, after receiving her clearance papers from St. Georges to New York, the tug towed another schooner to sea, then proceeded to Hamilton, from which port, after taking on coal and a life-boat, she started July 4, for New York, and was lost *en route*. In an action upon the policy, *held* that the trips so performed in towing the schooners were such deviations as forfeited the insurance.

(Argued February 5, 1884; decided February 26, 1884.)

APPEAL from judgment of the General Term of the Supreme Court, in the third judicial department, entered upon an order made February 2, 1883, which affirmed a judgment in favor of plaintiff, entered upon a verdict.

This action was upon a policy of marine insurance.

The material facts are stated in the opinion.

*Samuel Hand, Treadwell Cleveland* and *Calvin Frost* for appellant. In the absence of proof to the contrary the policy was presumptively binding and effectual from its date. (1 Phillips on Ins., § 127.) The fair and reasonable construction

of a policy like the one in suit is to extend it so as to cover the time during which preparations were being made for the voyage. (*Taylor* v. *Small,* 3 Mass. 347 ; *Forbes* v. *Wilson,* Park. on Ins. [7th ed.] 344; 2 Pars. on Ins. 48 ; Phillips on Ins., §§ 932-935; Marshall on Ins. [5th ed.] 206; Arnold on Ins. [5th ed.] 401 ; *Seaman* v. *Loring,* 1 Mason, 127, 140 ; *Kemble* v. *Bourne,* 1 Cai. 75 ; *Fernandez* v. *Gt. W. Ins. Co.,* 48 N. Y. 571 ; *Smith* v. *Steinback,* 2 Cai. Cas. 158 ; *Chitty* v. *Selwyn,* 2 Atk. 359 ; *Haughton* v. *Empire Marine Ins. Co.,* 1 Exq. Cas. 206 ; *Patrick* v. *Ludlow,* 3 Johns Cas. 14 ; 1 Arnold on Ins. 26.) Immediately after the policy attached the insurance was a continuous one. (*Fernandez* v. *Gt. W. Ins. Co.,* 48 N. Y. 571, 575.) Even assuming that the phrase " at Bermuda " protected the tug while moving from one port to another in Bermuda with reference to her voyage before she cleared for New York, it certainly did not after she had once cleared for New York, nor in undertaking independent ventures, towing vessels to sea, or to Hamilton from St. Georges. (*Nelson* v. *Ins. Co.,* 71 N. Y. 454 ; *Solby* v. *Whitmore,* 5 B. & A. 45.) Cases where under an insurance on a vessel, at and from an island at which there are different ports, it is held she may proceed from port to port without violating the terms of the policy, were all of them cases in which such going from port to port was for the purpose of receiving her cargo, and the decisions are placed on the ground that it was the implied understanding of the parties that the cargo should be collected from different parts of the island. (*Ware* v. *Miller,* 4 B. & C. 538 ; *Camden* v. *Crowley,* 1 Wm. Black, 417 ; *Cruikshank* v. *Jansen,* 2 Taunt. 301.) It was a deviation for the vessel to have remained at Mangrove bay all the rest of the afternoon of July 4, and all that night, after her return there. The delay avoided the policy. (*Fernandez* v. *Gt. W. Ins. Co.,* 583 ; *Kettell* v. *Wiggin,* 13 Mass. 71.) This vessel, having encountered no extraordinary perils of the sea, and having sunk in fine weather, the conclusive presumption is that she was unseaworthy at the time she started on her voyage, and at the time she left Mangrove bay on July 5, 1879, and the com-

plaint should have been dismissed on this ground. ( *Walsh* v. *Ins. Co.,* 32 N. Y. 437 ; *Talcott* v. *Ins. Co.,* 2 Johns. 123 ; *Prescott* v. *Ins. Co.,* 1 Whart. 401 ; *Warren* v. *Ins. Co.,* 2 Johns. Cas. 231 ; *Copeland* v. *N. E. Ins. Co.,* 2 Metc. 437, 438 ; *Paddock* v. *Ins. Co.,* 11 Pick. 227, 237 ; 2 Arnold on Ins. [Perkins' ed.] 371 ; Phillips on Ins., § 697 ; *Pickup* v. *Thames Ins. Co.,* L. R., 3 Q. B. Div. 594 ; *Watson* v. *Clark,* 1 Dow., par. 344 ; *Paddock* v. *Franklin* v. *Ins. Co.,* 11 Pick. 237 ; *Wright* v. *Orient Mut. Ins. Co.,* 6 Bosw. 269 ; *Patrick* v. *Hallet,* 1 Johns. 241 ; 3 Johns Cas. 76 ; *Barnewell* v. *Church,* 1 Cai. 217, 230.) It was the duty of those in charge of the tug, not only to ascertain that she was seaworthy at the commencement of the voyage, but to see that she remained so during the voyage. (*Paddock* v. *Franklin Ins. Co.,* 11 Pick. 227 ; 1 Pars. on Mar. Ins. 380, 381 ; Phillips on Ins., §§ 730, 731, 732.)

*Henry Heath* for respondents. The question of seaworthiness is one of fact. (*Knill* v. *Hooper,* 26 L. J., Ex. Ch. 377 ; *Sherwood* v. *Ruggles,* 2 Sandf. 55.) If the facts proved in the case can be held to raise a question of law on this point, they invoke no presumption which can overturn the verdict of the jury. ( *Walsh* v. *Washington Ins. Co.,* 32 N. Y. 427 ; *Suethen* v. *Memphis Ins. Co.,* 3 La. Ann. 474 ; *Anderson* v. *Morice,* L. R., 10 C. P. 58.) If the tug was seaworthy at the time of sailing from the port of Hamilton, and subsequently became unseaworthy, as the result of her striking after leaving Mangrove bay, the continuance of the voyage the next morning from Mangrove bay, devolved no liability upon the owner, unless it is shown that the master had knowledge or reason to believe that the vessel had received damage which rendered her unseaworthy. (*Starbuck* v. *N. E. Marine Ins. Co.,* 19 Pick. 198 ; 1 Arnold on Ins. 662 ; 2 id. 767 ; 1 Phillips on Ins. [5th ed.] 403.) The beginning of a voyage depends upon the intention of the parties in charge. This intention is to be gathered from all the facts and circumstances presented, and from the acts of the parties. It is, therefore, a question of fact for the jury, and

was in this case properly submitted for their decision. (*Dennis* v. *Ludlow*, 2 Cai. 111.) Taking out clearance papers from the custom-house at St. Georges was for convenience, the tug's papers being on file there, and did not necessarily involve the immediate cessation of her business, nor mark the beginning of her voyage, nor had it any relation to the policy of insurance. (*Barnewell* v. *Church*, 1 Cai. 217 ; *Dennis* v. *Ludlow*, 2 id. 111 ; *Risdale* v. *Newnham*, 3 M. & S. 455.) Where a pilot is taken on board for the purpose of navigating a vessel within his pilot grounds, it is entirely within his province to determine what is to be done with her at the time he takes charge, whether she should proceed or not, and whether she should take one course or another ; and, in case of loss or damage resulting therefrom, the underwriters are not relieved except in cases of gross negligence or fraud. (*The Soohlibo*, Eng. L. & Eq. 651 ; *Pollok* v. *McAlpine*, 7 Moore's P. C. 427 ; *The Agricola*, 2 Wm. Rob. 10 ; *The Guy Mannering*, 46 L. T. [N. S.] 905.) The proximate cause of the loss was a peril insured against. Assuming that the remote cause was the negligence of the master, pilot or crew, this would not relieve the insurers unless it was gross or fraudulent. (*Shore* v. *Bentall*, 7 B. & C. 798 ; *Waters* v. *Merch. L. Ins. Co.*, 11 Peters, 213 ; *Mathews* v. *Howard Ins. Co.*, 11 N. Y. 9.) Where the loss happens from one of the perils mentioned in the policy, the courts do not look further to ascertain what occasioned the happening of that cause or loss. (*Walker* v. *Maitland*, 5 B. & A. 171 ; *St. Louis Ins. Co.* v. *Glasgow*, 8 Mo. 713 ; *Copeland* v. *N. E. M. Ins. Co.*, 2 Metc. 432 ; *Fireman's Ins. Co.* v. *Powell*, 2 B. M. [Ky.] 311 ; *Sturm* v. *At. M. Ins. Co.*, 63 N. Y. 77 ; *Williams* v. *Suffolk Ins. Co.*, 13 Pet. 415 ; *Anderson* v. *Pacific Ins. Co.*, L. R., 7 C. P. 65 ; *Champlin* v. *R. P. Ass. Co.*, 6 Lans. 71 ; *Dixon* v. *Sadler*, 5 M. & W. 405 ; *Redman* v. *Wilson*, 14 id. 476 ; *Keeler* v. *Fireman's Ins. Co.*, 3 Hill, 250 ; *Am. Ins. Co.* v. *Pryan*, 26 Wend. 563.) It is always competent for a person charged with fraud to deny intent. The weight to be given such evi-

dence is a question for the jury. (*Starin* v. *Kelly*, 88 N. Y. 418.)

RUGER, Ch. J.    On June 13, 1879, the defendant executed and delivered a marine policy of insurance, for account of whom it might concern, upon the steam tug " C. F. Acker-man," belonging to the plaintiff's testator, " lost or not lost, at and from Bermuda to New York," to sail during the month of July.    The policy also contained the following clause : " Beginning the adventure upon the said vessel, tackle, apparel, etc., at and from as aforesaid, and so shall *continue and endure* until the said vessel be safely arrived at as aforesaid, etc., and until she lie moored twenty and four hours in good safety.    And it shall and may be lawful for the said vessel in her voyage to proceed and sail to, touch and stay at any ports or places, if thereunto obliged by stress of weather or other unavoidable accident, without prejudice to this insurance." At the time of the insurance, the tug was lying at St. Georges, in the Bermudas, and sailing thence on July 4, became water-logged, in consequence of a leak, the location of which was undiscovered, and sank in the open sea, about nine o'clock, P. M., of the next day.    She was then about seventy miles from the island, and was upon her voyage to New York. The captain and crew escaped in the life boat attached to the tug, and returned in safety to the island.

Several defenses to this action, brought by the owners upon the policy, were pleaded, and among them were the alleged unseaworthiness of the tug, collusion by the plaintiff's testator in causing the loss in question, and a deviation from her course by the tug, after the voyage policy had attached.

We are of opinion that the questions arising upon the first two grounds stated were properly disposed of at the trial by leaving them to the jury upon the evidence as questions of fact, and that the conclusions arrived at by them are not subject to review here.

The serious question in the case arises upon the defense of deviation.    The terms used in the policy by which the tug was insured, " lost or not lost at and from Bermuda," would,

in the absence of any qualifying language, indicate an intention to have the insurance attach immediately upon the subject thereof at the place of its location. (Phillips on Insurance, §§ 925, 932, 933.) No provision is made in the policy for the employment of the tug while remaining at Bermuda, and it is obvious if it attached at the time of its date any employment requiring the movement of the tug from the port where it was then lying, except for the voyage mentioned in the policy, would create a fatal deviation.

It is, however, unnecessary in this opinion to inquire into the force or significance of the words referred to as affecting the rights of the respective parties to the policy previous to the time when the voyage policy attached, inasmuch as it was substantially conceded by the parties on the argument that the question of deviation depended mainly upon the time when the voyage risk commenced under the policy. If such a liability was incurred under this policy as is known and described by its terms as a "port risk," it certainly terminated when the voyage risk commenced, and affects the question under discussion only as it may aid in determining when the latter risk actually commenced.

A deviation from the described course or employment of an insured vessel, unless compelled by necessity at any time after the liability under the policy attaches, constitutes a defense to an action thereon for a subsequent loss, however slight or harmless the deviation may appear to be. (3 Kent's Com. 312; *Stevens* v. *Com. Mut. Ins. Co.*, 26 N. Y. 402; *Fernandez* v. *Gt. West. Ins. Co.*, 48 id. 572; 8 Am. Rep. 571.) Neither is it material whether such deviation occurs during the time while the vessel is in port waiting for the voyage to commence or takes place thereafter, provided the policy covers the period of waiting by the use therein of the terms, "at and from" the port specified. (*Fernandez Case, supra.*)

The time when a liability under a policy of insurance upon freight attaches to the subject of insurance under the language "at and from" a certain port, is well settled to be, from the time it is placed on the vessel, in preparation for the voyage

contemplated. (*Mellish* v. *Allnutt*, 2 Maule & S. 106; *Smith* v. *Mobile, etc., Ins. Co.*, 30 Ala. [N. S.] 167; *Mobile, etc., Ins. Co.* v. *McMillan*, 31 id. 711; *Patrick* v. *Ludlow*, 3 Johns. Cas. 14.)

In the case of an insurance upon a vessel lying in port, for a voyage risk, described as being "at and from" a given port, it is quite uniformly held that the policy attaches at the time of the commencement of the preparations for the voyage. (*Taylor* v. *Lowell*, 3 Mass. 347; *Kemble* v. *Bowne*, 1 Cai. 75; *Grant* v. *King*, 4 Esp. 174; *Seamans* v. *Loring*, 1 Mason C. C. Rep. 128; Phillips on Ins., § 935.) When a vessel is insured for a voyage as, "at and from" a certain place, and the ship is not then in port, the policy commences to run from the time it safely arrives at the specified port, and continues during its stay while preparing for the voyage insured against. (*Bell* v *Bell*, 2 Camp. 475; *Patrick* v. *Ludlow*, 3 Johns. Cas. 10.) No force or meaning can be given to the words "at a port," as used in such a policy, which does not cover a certain period of time anterior to the actual sailing of the vessel upon her voyage.

The question to be determined in this case is, what the period of time is, as indicated by the language used in the policy, during which the property insured is under the protection of the insurance. Assuming, as we must, that it covers some time prior to the departure of the vessel from port, we can ascribe no other intention to the parties, than that it should cover the time spent in performing that which was the necessary incident of the main object of the contract. In the case of *Fernandez* v. *Great Western Ins. Co.*, *supra*, it was held that a policy of insurance, dated on the 18th day of March, 1863, upon a vessel then in port for a voyage, "at and from New York to Havanna" to sail in a few days, attached at the date of the policy and that a trial trip made by the vessel, on the 6th of April thereafter, a distance of sixteen miles, to Elizabethport, where she took in coal, and then returned to New York, was a fatal deviation, and barred a recovery for a loss subsequently occurring.

The authorities upon the question of the deviation by a vessel

from an insured voyage are very numerous, and seem uniformly to hold the insured to the strictest pursuit of the precise course indicated in the policy for the voyage.

If the insurance covers the period of the vessel's stay in port, she has no right during that period to engage in any business, except the making of preparation for her voyage, and when those preparations are completed, to sail without delay by the ordinary and usual course for the port of destination. (*Reade* v. *Com. Ins. Co.*, 3 Johns. 352.) In *Brown* v. *Tayleur* (4 Ad. and Ellis, 241; *S. C.*, 31 Eng. C. L. Rep. 61), the "Penrith" was insured "at and from her port of loading in North America to Liverpool." The vessel took a part of her cargo at Cocagne, and then went to Buktouche, a village distant from Cocagne, about five miles, situated on the waters of the same bay with Cocagne, to complete her cargo. Not finding a cargo there, she returned to Cocagne, and after finishing her loading, sailed from thence for England, and was lost. It was held that the trip to Bucktouche constituted a deviation, which avoided the policy.

This case has been frequently referred to as authority in subsequent cases, and seems to be quite applicable to the one in hand. *Vos and Lightbourne* v. *Robinson* (9 Johns. 192) is also very much in point. The insurance was "at and from Port Plata, St. Domingo, to New York." Cargoes are never taken on board at La Plata, but it was the custom of trade to pick up a cargo on the coast near that port, in the district of La Plata. While attempting to gather a cargo within that district, the vessel was lost, owing to the violence of the winds which drove her upon the rocks. This was held a deviation which forfeited the policy. In *Kettell* v. *Wiggin* (13 Mass. 68), the vessel was insured "from Boston to Gibraltar, and from thence to her port of discharge in the United States, with liberty to proceed to St. Ubes on the Cape de Verd islands for salt." The vessel arrived at the Cape de Verd islands, and while waiting for a cargo, was induced by the governor of the islands, upon a promise to load her earlier than she could otherwise get a cargo, to go to St. Jago and Fuego, two other

of the Cape de Verd islands, to bring a cargo of provisions to Isle of May. The captain of the vessel consented to do so, and was thereby enabled to obtain her cargo of salt several weeks earlier than could otherwise be done. The vessel was afterward lost by the perils insured against; and it was held that the trip to St. Jago was a deviation which forfeited the policy. A similar application of the principle was made in *Stevens* v. *Commercial Mut. Ins. Co.* (26 N. Y. 397).

An examination of the facts of this case shows that it is clearly within the principles laid down with great uniformity not only by elementary writers, but also in the reported cases above cited. The undisputed evidence in the case shows, that active preparation for the voyage in question commenced at the Port of St. Georges, on June 30, 1879, and continued until the vessel took her departure. On that day a captain, specially hired for the voyage, went on board. The keeping of the log was then commenced by him, and was continued daily from that time until the occurrence of the loss. Carpenters were then at work on the tug, fitting her for the ocean voyage. These preparations continued on July 1; on July 2 the crew were shipped, and the captain entered in the log the fact of his taking charge of the vessel. He was on that day paid the agreed price for his services, for the voyage, by the plaintiff's agent. On July 3 the preparations for the voyage were continued; provisions and water were taken on board, and clearance papers taken out from the custom house at St. Georges, for a voyage from that place to New York.

After these preparations had commenced, and on July 2, the Ackermann left her berth at St. Georges and steamed to Hamilton, a distance of about twenty miles, and taking the Eliza Barss, a schooner, from that port, in tow, brought her back to St. Georges, and from there towed her out to sea to Five Fathoms Hole, a distance of about five miles from St. Georges. After casting her off the tug returned to her berth at St. Georges, and continued the preparations for her voyage to New York. On July 3, after receiving her clearance papers from the custom house at St. Georges, for New York, the tug

towed to sea the schooner "Hound," through St. Georges' channel, and then returned to the interior waters of the Bermudas, and proceeded to the port of Hamilton. From this port, after taking on coal and a life boat, she started for New York, through a long, intricate and dangerous channel, known as "Chub Cut," on the morning of July 4.

Without considering the question as to whether the "Chub Cut" channel, as distinguished from the St. Georges' channel, was the usual and ordinary course for vessels of the character and capacity of the Ackermann, to pursue upon a voyage from the Bermudas to New York, we are of the opinion that the trips performed by the tug on the 2d and 3d days of July, respectively, in towing out to sea the schooners "Eliza Barss" and "Hound" were such deviations from the voyage and perils insured against as vitiated her insurance.

That the voyage actually commenced at St. Georges on the 3d day of July, conclusively appears, not only from the entries in the log made by the captain of the tug, but also by the protest sworn to before the United States commercial agent at St. Georges, July 7, by the captain, chief engineer and seamen of the Ackermann after the loss had occurred, and which were produced in evidence by the plaintiffs on the trial.

It thus appears, that after the voyage had actually commenced, the tug departed from it, and taking the Hound in tow, steamed in an opposite direction from the one she intended to pursue upon her voyage, and proceeded five miles to sea, presumably under hire, and then after discharging her tow returned to prosecute the voyage insured against.

This trip was, we think, within all of the authorities, a fatal deviation. Whatever contention may arise over other questions in the case, it cannot, we think, be questioned that a vessel which leaves the port of her departure in pursuit of the insured voyage, without the intention of returning, has commenced her voyage in such a sense as to be protected by a policy of insurance, covering her from perils during such voyage, and that an independent voyage undertaken by her, after such a departure, causes a forfeiture of her insurance. Thus it was

Statement of case.

held in *Nelson* v. *Sun Mutual Ins. Co.* (71 N. Y. 454), where a vessel was insured under a " port risk " and was swept by the tide upon a rock, and injured while being towed out of the harbor, that she was not protected by such an insurance ; and that when she left the pier at which she had been moored, the " port risk " terminated, and the " voyage risk," began.

It seems to us that when the Ackermann left St. Georges, her " voyage risk " clearly commenced, and her subsequent employment in towing the " Hound " to sea not only increased the perils, but subjected the insurers to liabilities which they had not contracted for. As was said in the case of *Kettel* v. *Wiggins, supra,* "to test this, let us inquire whether the vessel was at the risk of the underwriters from the Isle of May to Fuego and back. It was not within the terms of the policy ; it was not necessary unless it had become so by the culpable neglect of the master. Had the vessel been lost upon that voyage, the underwriters could not have been held answerable. The policy then had ceased to protect the vessel, and it is not possible that any thing subsequent should restore the obligations of the underwriters."

We are therefore of the opinion that the judgment should be reversed, and a new trial ordered, with costs to abide the event.

All concur.

Judgment reversed.